UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**03  CV  2247**

TYCO INTERNATIONAL LTD.,
a Bermuda corporation, and
TYCO INTERNATIONAL (US) INC.,
a Nevada corporation,

No.



RECEIVED
APR - 1 2003
U.S.D.C. S.D. N.Y.
CASHIERS

                              Plaintiffs,

                v.

MARK H. SWARTZ,

COMPLAINT

                              Defendant.

---

Plaintiffs Tyco International Ltd. and Tyco International (US) Inc. (collectively "Tyco" or "the Company"), by its undersigned counsel Boies, Schiller & Flexner LLP, as and for its Complaint herein, aver as follows with knowledge of its own actions and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.     Mark H. Swartz ("Swartz") was Tyco's Chief Financial Officer from February 1995 until September 11, 2002, and a member of Tyco's Board of Directors from February 2001 through August 1, 2002.  On August 1, 2002 Tyco's Chairman and Chief Executive Officer Edward Breen sought and received Mr. Swartz's resignation as a member of the Board and his agreement to resign as CFO upon the selection of his successor.

2.    The August 1, 2002 agreement memorializing Swartz's resignation (the
"Agreement") provided that "all disputes between them arising from or concerning
Swartz's employment at the Company will be subject to binding arbitration." (See Ex.1,
attached hereto.)  One such dispute involves Swartz's entitlement to the benefits of his
Retention Agreement, dated January 22, 2001, which, in turn, expressly requires
arbitration before the American Arbitration Association (the "AAA").  (See Ex. 2,
attached hereto.)

3.    After Swartz's departure from Tyco, numerous facts related to Swartz's
violation of his duties of honesty, good faith, care and loyalty during the course of his
employment at Tyco were uncovered.  On October 7, 2002, Tyco initiated an arbitral
proceeding against Swartz with the American Arbitration Association (the "AAA").

4.    Despite repeated efforts by Tyco to reach an agreement regarding arbitration
procedures, Swartz refused to comply with the Agreement.  Swartz's counsel
unequivocally informed Tyco and the AAA that "Mr. Swartz does not consent to the
AAA's administration of this matter and does not agree to participate in the arbitration
filed with the AAA." (See Ex. 3, attached hereto.)  Swartz also notified Tyco that
consent to a stay of arbitration "would be necessary before Mr. Swartz would agree to
participate in any arbitration."

5.    On March 21, 2003, upon Swartz's improper refusal to arbitrate, the AAA
returned the filing fee to Tyco and declined to administer the case because the "Parties
were unable to agree." (See Ex. 4, attached hereto.)  Lacking other remedies and
confronted with Swartz's refusal to arbitrate, Tyco is compelled to initiate this action.

6.   During his time at Tyco, Swartz was one of the highest, if not the highest, compensated chief financial officers in the country. Despite that substantial compensation, beginning at least as early as 1995, Swartz failed to fulfill competently and faithfully the duties that had been entrusted to him by Tyco's Board of Directors, which was the consideration for the compensation that he received. Instead, Swartz improperly took Tyco funds and assets personally, and aided, abetted, and facilitated the misappropriation of Tyco funds and assets by others. Swartz also acted with other officers of Tyco, including former Chief Executive Officer L. Dennis Kozlowski ("Kozlowski"), to conceal their misconduct and his own.

7.   As discussed in more detail below, Swartz's conduct included:

a.   Abusing Tyco loan programs to use millions of dollars of Company funds to speculate in real estate and personal investments;

b.   Directing a subordinate in 1999 to enter unapproved Key Employee Loan Program credits, which improperly benefited Kozlowski by $25 million, an event planner by $1 million, and Swartz himself by $12.5 million;

c.   Taking an unauthorized "special bonus" in September 2000 that forgave his multi-million dollar relocation loans and corresponding tax liabilities, and concealing the existence of the forgiveness program;

d.   Taking another unauthorized multi-million dollar bonus in November 2000 for similar purposes and concealing the existence of the bonus program;

e.   Paying, and failing to inform the Board of, an unauthorized $20 million fee to Frank Walsh, then a Tyco director, in July 2001 in connection with Tyco's acquisition of The CIT Group;

3

    f.  Engaging in self-dealing transactions involving
Company assets, including restricted share transactions,
various real estate purchases, and other personal use of
company assets;

    g.  Approving and facilitating acts of self-dealing by
other officers; and

    h.  Inducing other officers and agents to fail to provide
the faithful and competent services they were obligated to
provide to the Company.

8.    The total amount of damages proximately caused by Swartz's misconduct is

not yet known, but as set forth herein, Swartz's conduct caused him to be enriched, and

the Company to be harmed, in at least the following amounts:

    a.  Unauthorized "TyCom Bonus" -- Implementation and
concealment of an unauthorized Florida relocation loan
forgiveness program with a total cost to the Company of
$95,962,653, including $16,610,687 for his own unauthorized
bonus;

    b.  Unauthorized "ADT Automotive Bonus" -- Implementation
and concealment of an additional relocation loan forgiveness
program with a total cost to the Company of $55,954,455,
including $12,844,632 for his own unauthorized bonus;

    c.  Unauthorized "Flag Telecom Bonus" -- Misleading the
Compensation Committee into awarding bonuses based upon a
non-existent gain on the sale of TyCom shares, at a total cost to the
Company of $15,378,700, including $6,971,695 for Swartz;

    d.  Failure To Provide Faithful and Competent Services --
Accepting compensation from 1997 through 2002 for loyal
services that were never rendered in the amounts of $9,872,330 for
1997; $31,572,789 for 1998;  $10,631,589 for 1999; $60,736,112
for 2000; $18,592,556 for 2001; and $12,304,600 for 2002, for a
total  compensation of $143,709,976 and the following additional
benefits since at least 1997 as follows:

- Deferred Compensation Benefits ($10,425,839 previously
  paid),

4

- Supplemental Executive Retirement Plan, valued as of July 31, 2002 ($656,286 previously paid),

- Executive Retirement Agreement, valued under a current value lump sum election, as of July 31, 2002 ($24,493,956),

- FY 2000 Executive Life Insurance, valued as of July 31, 2002 ($24,544,077 previously paid),

- 2001 Retention Agreement, as amended, including a $9,075,000 lump sum payment  (previously paid) and vesting of 702,533 shares of Tyco stock and 2,028,325 stock options (previously vested), and

- All stock and stock options received from Tyco, and the proceeds from any and all dispositions thereof, since at least 1997.

e.  Unauthorized Transactions -- Improperly awarding himself an amount unknown, but in excess of $10 million in Company funds and/or equities for personal losses and equity transactions;

f.  Unauthorized Approvals of Other Officers' Acts of Self-Dealing – Approving and implementing unauthorized payments to Kozlowski, Walsh, and others in an amount not now known, but in excess of $75 million; and

g.  Failure to Reimburse for Personal Use of Company Property or Assets  -- Misusing Company property or assets and for improper reimbursements in an amount not now known, but in excess of $5 million.

## PARTIES

9.    Plaintiff Tyco International Ltd. is a Bermuda corporation with its principal

place of business at The Zurich Centre, 90 Pitts Bay Road, Pembroke HM 08, Bermuda.

10.   Plaintiff Tyco International (US) Inc., a wholly owned indirect subsidiary of Tyco International Ltd., is a Nevada corporation with its principal place of business at One Tyco Park, Exeter, New Hampshire 03833.

11.   Defendant Mark H. Swartz is a citizen and resident of the State of Florida, residing at 700 Lake Drive, Boca Raton, Florida 33432.

## JURISDICTION AND VENUE

12.   The Court has jurisdiction over this action based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

13.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) because Tyco maintains corporate offices in this District; Swartz regularly attended business meetings in this District; other meetings, communications and events relating to the events set forth herein occurred in this District; and several parcels of real estate that Swartz used or acquired as part of his unlawful conduct are located in this District.

## FACTS COMMON TO ALL CLAIMS

14.   In April 1991, Swartz joined Tyco as assistant controller.  He had formerly been associated with the accounting firm of Deloitte & Touche.   In February 1995, Swartz became the Company's Chief Financial Officer.  In February 2001, he was elected to the Board of Directors of the Company.

15.   As Tyco's Chief Financial Officer from 1995 until August 1, 2002 (when Ed Breen, the new Tyco Chairman and Chief Executive Officer, requested and received his resignation), Swartz owed the Company fiduciary duties of honesty, good faith, care, and loyalty.  Swartz also knew that Tyco's Board of Directors reposed great trust and confidence in him.

### Swartz's Relocation To New York Under the Specially-Tailored, Unapproved Relocation Plan

16.   In August 1995, in anticipation of a Company-sponsored relocation of some of its personnel from Exeter, New Hampshire to New York City, Swartz gave a presentation of his proposed relocation plan (the "Approved Program") to the Compensation Committee of Tyco's Board of Directors.  (See Ex. 5, attached hereto.) That  Approved Program was adopted by the Compensation Committee and reported to the Board of Directors.  (See Ex. 6, attached hereto.)

17.   The Approved Program was "intended not to discriminate in scope, terms or operation in favor of executive officers or directors of the Company and is to be available generally to all applicable salaried employees."

18.   Although the Approved Program was generally proposed to many employees who ultimately chose not to relocate, it was never implemented.  Rather, a second more generous plan "tailored to each individual's circumstances" and limited to five or six executives and one assistant (the "Unapproved Plan") – was implemented.

19.   The Unapproved Plan differed in several significant ways from the Approved Program, chief among which were that it was almost doubly as generous as the

7

Approved Program.  Although it contained recitations that it had been duly approved by

the Compensation Committee of the Board, it had never been submitted to, much less

approved by, that Committee or the Board.

      20.   The relocation to New York, effected under the Unapproved Plan, permitted

Swartz to benefit in many ways that would not have been permitted by the Approved

Program.  Among other things, Swartz used the Unapproved Plan to:

      a.   Rent an East Side apartment (30 East 85th Street, Apt. 26/27 A, New York City), with annual rental of $210,000, paid for by the Company, from 1995 to 1997.  The Approved Program permitted temporary rental housing reimbursement for only 12 months and thus would not have permitted this benefit.

      b.   Sell two New Hampshire homes to the Company: (1) on December 2, 1995, Swartz sold 3 Runawit Road, Rye, New Hampshire to the Company for $305,000 (plus an additional $46,000 in excess of an appraisal) and nearly $90,000 more than the property's resale price by Tyco the following fiscal year; and (2) in January 1997, Swartz sold 66 Front Street, Exeter, New Hampshire to the Company, for $464,000 unsupported by an appraisal and nearly $114,000 more than the property's resale price by Tyco the next year.  The Approved Program permitted the sale of one property to the company, supported by at least one independent appraisal and thus would not have permitted these benefits.

      c.   Purchase two properties, one at 24 Straw's Points Road, Rye, New Hampshire, on January 25, 1996, and the other in New York at the Trump International Hotel and Tower Condominium located at 1 Central Park West Tower Unit 43-A, on August 1, 1997.  These benefits violated the Approved Program because the financing taken by Swartz from the Company exceeded the maximum he was entitled to borrow under the Approved Program, which also permitted financing for the purchase on only one property.

      d.   Cause the Company to purchase and improve two New York properties for Swartz's personal benefit:  one luxury apartment in April 2000 (30 East 85th Street, Apt. 28/29 A/B) for

$10,599,513; and a second, more extravagant penthouse apartment on Central Park South (50 Central Park South, New York) in 2001 for $16,543,402 – all without disclosing to the Board or its Compensation or Audit Committees that the apartments were paid for and carried by the Company as a corporate asset. The Approved Program did not permit both financial assistance on the purchase of a New York property and the rental of a New York Property and thus would not have permitted these benefits.

e. Send his children to private New York schools at the expense of the Company. The Approved Program would not have permitted this benefit.

f. "Gross-up" the benefits received under the Unapproved Plan so as to insulate Swartz from all state income tax liability that he incurred after relocating to New York. Swartz also enjoyed the benefits considerably longer than the Approved Program was designed to operate.

21.    As the officer responsible for the preparation of the Company's proxy statements, Swartz knew that the Compensation Committee was required to "set the level of compensation and benefits for the Company's executive officers and key managers." (Definitive Proxy Statement, Form DEF 14A, filed Sept. 25, 1995).

22.    Swartz knew that the Unapproved Plan used by him and a few key executive officers was not the plan that he had presented to the Compensation Committee for its approval and he also knew that the Unapproved Plan was not the plan that was approved by Compensation Committee.

### Abuse Of The Key Employee Loan Program and Unauthorized 1999 Credits

23.    The KEL Program was instituted to encourage ownership of the Company's common stock by executives and other key employees. (See Exs. 8 and 9.) Through the

KEL program Swartz and others were permitted to borrow funds to pay taxes that became due when shares granted under Tyco's restricted share ownership plan vested. The purpose of the program was to obviate the necessity for key employees to liquidate shares to satisfy tax liability – i.e., to allow key employees to retain their ownership interests in the Company and thus further align their economic interests with those of the Company.

24.     Swartz violated both the purpose and the specific restrictions of the KEL program. From 1997 to his departure, Swartz borrowed $99,093,460 in KEL loans. Of his total KEL loans, more than $86,208,567 was used by Swartz for private investments unconnected with the stated purpose of the program including at least $20,125,000 to his private investment accounts and $42,000,000 for unspecified loans. (See Ex. 10, attached hereto.)

25.     With no prior Board or Compensation Committee approval, Swartz directed one of his subordinates (whom he rewarded with a special $125,000 bonus) in August 1999 to cause Kozlowski's KEL account to be credited in the amount of $25 million, Swartz's own KEL account to be credited in the amount of $12.5 million, and the KEL account of a corporate event planner to be credited another $1 million (even though doing so created a credit balance in her account). (See Ex. 11, attached hereto.) As Swartz was aware, these "credits" were not disclosed to, nor approved by, the Compensation Committee or the Board, as the Company's proxy statements, prepared under Swartz's supervision, provided they must be (Definitive Proxy Statement, Form DEF 14A, filed Feb. 20, 1998 at 12) nor were they included in his income reported on his 1999 W-2, which was prepared under his supervision. Upon discovery of these unauthorized journal

10

entries during the course of the Company's investigation, on July 18, 2002, these entries were reversed at the direction of the Tyco Board.

### The Unauthorized 1998 Florida Relocation Program

26.   After Tyco's 1997 reverse merger with ADT, Ltd., Kozlowski decided to relocate more than 40 corporate employees from Tyco's headquarters in Exeter, New Hampshire to Boca Raton, Florida.  To do so, Swartz directly and/or through one of his subordinates adapted the terms of the previous relocation programs, without obtaining Board or Compensation Committee approval.

27.   Again, two versions of the Florida relocation program were generated, one for general application administered through the Human Resources Department  (see Ex. 12, attached hereto)  and a second, more generous plan ("the Elite Florida Plan") maintained in the files of the Finance Department, for use by certain executives only  (see Ex. 13, attached hereto.)  The Elite Florida Plan did not condition participation in the program upon the sale of a principal residence.  Neither plan was approved by the Board or its Compensation Committee.

28.   While still maintaining his primary residence in Exeter, Swartz used the Elite Florida Plan in 1998 to obtain $20,992,000 in interest-free loans, which he used to purchase two lots in "The Sanctuary" at 5001 Egret Circle, Boca Raton.  No mortgages were recorded on the Florida properties, as required by the purported plan guidelines and as required to qualify for tax-exempt status for interest-free loans.

29.   As the Company officer who presented the original Approved Program to the Compensation Committee for its approval in 1995, Swartz knew that Board or

Compensation Committee approval was a necessary prerequisite for the adoption of any Florida relocation program. Swartz also knew that that neither the Compensation Committee nor the Board had approved the Florida Relocation Program.

**Unauthorized 2000 Forgiveness Of Florida
Relocation Loans – The "TyCom" Bonus**

30.    In early September 2000, Kozlowski informed Swartz and a senior representative of Tyco's Human Resources department that, in addition to cash and share bonuses for the successful completion of an initial public offering ("IPO") of a Company subsidiary (TyCom), the Board had decided to forgive all of the relocation loans for more than 40 employees who had relocated to Florida in 1998 and to pay the employees' income taxes associated with such loan forgiveness. (Hereinafter, the "TyCom Bonus".)

31.    Swartz knew, including through his familiarity with the Company's proxy statements prepared under his direction, that the "compensation program" represented by the Florida loan forgiveness for executive officers and key managers was not within the discretion of the Chief Executive to award without Board or Compensation Committee approval. (Definitive Proxy Statement, Form DEF 14A, filed March 1, 2000 at 16.) Swartz also knew there had been no Compensation Committee or Board of Directors approval of the TyCom Bonus.

32.    To ensure the TyCom Bonus was kept secret from the Board and its Audit Committee, Swartz through his subordinates caused all participants, in exchange for the loan forgiveness, to execute confidentiality agreements that provided:

> "if you do not keep the terms of this Agreement confidential, you agree that the Company may, at its option, and in addition to any other remedies

12

the Company may have, rescind this Agreement and require payment on the [Forgiven Amount] within ninety days." (See Ex.14, attached hereto.)

33.   Swartz further concealed the TyCom Bonus and the forgiveness benefits from the Board and its Audit Committee by hiding its costs, or causing his subordinates to hide its costs, in disparate accounts, where its materiality was obfuscated in the context of an income statement showing net income in 2000 of over $4.5 billion.   (See Ex. 15, attached hereto.)

34.   As part of this concealment, Swartz later signed a memorandum to the files, not revealed to the Board or its Compensation or Audit Committees, that purported to support this accounting treatment and to justify charging the expense of the forgiveness program to the TyCom IPO:

> "We have decided to award special bonuses to various Tyco employees for their efforts over the past few years in enhancing the value of TyCom, and thereby contributing to this gain [associated with the successful completion of the TyCom IPO]. Selected employees will receive their bonus in the form of Cash, forgiveness of relocation loans, and/or Tyco Common shares under Tyco's restricted stock program." (See Ex. 16, attached hereto.)

35.   Swartz also signed a Representation Letter on December 19, 2000 to the Company's auditors (as did Kozlowski and the former and then-current Senior Vice Presidents of Finance) that the following representation was fair and in conformity with GAAP:

> "In connection with the calculation of the $1,760 million gain on the public offering of shares in TyCom Ltd., the Company has deducted incremental bonus expenses of $85.1 million from the net proceeds received.  These expenses represent remuneration of key Tyco and TyCom employees, paid solely in connection with their contributions on behalf of Tyco to the operation of TyCom Ltd. in prior periods and to the offering process.  This remuneration is

13

incremental to the employee's customary bonuses and is a direct result of the public offering of TyCom Ltd. shares." (See Ex. 17, attached hereto.)

These representations substantiated only a portion of the entire cost of the TyCom Bonus program and, while they included the cost of the forgiveness of the relocation loans for the some of the employees who had relocated to Florida in 1998, they did not substantiate the cost of reimbursing the employees' income taxes associated with loan forgiveness and, thus, they did not disclose the full costs of the TyCom Bonus program.

36.    Swartz knew that neither the Compensation Committee nor the Board had approved such a relocation loan forgiveness program.  Indeed, the week following the implementation of the forgiveness program, the Compensation Committee – unaware, as Swartz knew, of the forgiveness award to Swartz of nearly $17 million effected only a few days earlier – considered and approved a cash bonus of $1,400,000 for Swartz and awarded 148,000 restricted shares to Swartz for "the completion of the initial public offering of TyCom Ltd." (See Ex.18, attached hereto.)

37.    The direct personal benefit to Swartz from the unauthorized loan forgiveness program was $16,610,687. (See Ex. 19, attached hereto.)  The aggregate cost to the Company of the unauthorized loan forgiveness program was almost $100 million. (See Ex. 20, attached hereto.)

**Unauthorized 2000 "ADT Automotive" Bonus**

38.    A few weeks later, in November 2000, Swartz participated in another special bonus program, also containing purported relocation benefits (hereinafter, the

14

"ADT Automotive Bonus"), none of the elements of which (cash bonus, restricted share awards, or loan forgiveness) was approved by the Compensation Committee.

39.    On November 7, 2000, Kozlowski advised a senior representative of Tyco's Human Resources department that eight of his executive officers and key managers – including Swartz – had "vested in shares of restricted stock in conjunction with work related to the sale of ADT Automotive." (See Ex. 21, attached hereto.)  One week later, Kozlowski sent a letter thanking them for their many contributions towards the successful divestiture of Tyco's ADT Automotive business and describing cash bonuses and "relocation" payments they would receive in recognition of their contribution.  (See Ex. 22, attached hereto.)

40.    However, all of the officers designated as recipients of relocation benefits in the ADT Automotive Bonus program, including Swartz (see Ex. 23 and 24, attached hereto), had fully recovered all of their relocation expenses under the just-completed, unauthorized "TyCom Bonus."  (Cf. Ex 17, attached hereto.)  The reference to relocation payment was, as Swartz knew, merely a subterfuge.

41.    Swartz improperly allocated the ADT Automotive Bonus payments to various accounts, added them to the direct selling costs incurred in the ADT Automotive sale (which were in turn netted against the gain associated with the divestiture) (see Ex. 23, attached hereto), and represented to the Company's auditors that the bonuses were proper.  He thereby successfully concealed the true nature of the unapproved ADT Automotive Bonus from the Board and its Compensation Committee.

42.   Swartz's assistant then conducted a separate payroll run and generated separate, additional  W-2  statements for the year 2000 for each of the participants – including Swartz – in the bogus ADT Automotive Bonus.  (See Ex. 25, attached hereto.)

43.   The direct, personal benefit received by Swartz alone under the ADT Automotive Bonus was approximately $12,844,632, of which approximately $4.2 million represented the value of 74,000 restricted shares (the vesting of which was never approved by the Compensation Committee) and another $8.3 million in purported relocation benefits. The aggregate cost to the Company of the unauthorized ADT Automotive Bonus program was over $55 million. (See Ex. 23 attached hereto.)

44.   Unknown to the Board, Swartz's W-2 income in calendar year 2000 alone was $60,735,241.81. (See Ex. 25, attached hereto.) Through these "special bonus" artifices, Swartz ensured that neither the Compensation Committee nor the Board would learn about the total of his unauthorized true compensation.

### Unjustified Executive Life Insurance Benefit

45.   On October 3, 2000, while Swartz continued to conceal from the Compensation Committee his forgiveness benefits under the TyCom and ADT Automotive Bonus programs, the Compensation Committee was induced to expand his compensation and to grant him another 300,000 shares of Company stock. The Compensation Committee also funded a lucrative Executive Life Insurance Program for Swartz worth approximately $10 million.

46.   In October 2001, the Compensation Committee – still uninformed about the true income that Swartz had received through secret benefits – approved a second

16

funding stream for his Executive Life Insurance Program worth approximately $13 million.

### Fraudulently Procured 2001 Retention Agreement and Amendment

47.   On January 22, 2001, Swartz negotiated a retention agreement "to ensure the continued leadership by Tyco's CFO for a five year period." (See Term Sheet attached to Ex. 26, attached hereto.)

48.   According to the Term Sheet presented at the January 22, 2001 Compensation Committee meeting, the retention agreement provided benefits in the form of annual base salary, proxy bonus, and other benefits, worth approximately $9,075,000.

49.   However, in July 2001, Swartz, through a subordinate, suggested an amendment to the retention agreement, substituting for the term "highest annual proxy bonus" the term "highest annual bonus (including cash, shares and other forms of consideration) earned." (See Ex. 27, attached hereto.)

50.   The effect of the amendment was to increase the monetary value of his retention agreement more than tenfold, to an amount that exceeded $100,000,000.

51.   Although, by this time, Swartz had become a Director of the Company, Swartz never disclosed to  the Compensation Committee that Swartz's "earned bonus" was materially different from his "proxy bonus."  Nor did Swartz ever disclose the true financial impact of the amendment.

**Unjustified Vestings**

52.     In other cases of self-dealing, Swartz caused previously issued Company shares to vest for executive officers and key managers, including Swartz, without appropriate approvals.

53.     In one such example, as part of a purported gain on the exchange of TyCom shares for an equity interest in Flag Telecom Holdings Ltd. ("Flag") in 2001, Swartz caused 290,000 previously issued Company shares to vest for certain executive officers. The Company reported a $79,364,700 gain associated with the exchange of TyCom shares for the Flag equity on June 20, 2001. That same day, Swartz and his confederates caused the Company to accelerate the vesting date of 77,500 of Swartz's shares, and grant an additional 53,967 shares for a gross-up value, which Swartz immediately resold to the Company. (Hereafter, the "Flag Bonus".)

54.     However, Swartz did not seek or obtain approval for his Flag Bonus until two months later, at the October 1, 2001 Compensation Committee meeting. By this time, the gain on the Flag transaction had become an unrealized loss – significantly in excess of the June 20 gain – yet the Committee was misled into awarding the bonuses "in conjunction with the gain on the sale of TyCom shares." (See Ex. 28, attached hereto.)

55.     The cost to the Company related to the award of these shares alone to Swartz exceeded $6,971,695. The total cost to the Company for this accelerated vesting exceeded $15,378,700.

56.     Although, by October 2001, Swartz had become a Director of the Company, Swartz never disclosed the true changed economics of the Flag transaction to

the Compensation Committee immediately prior to its approval of the award.  Nor did he

ever correct the misinformation upon which the Committee predicated the Flag awards to

him.

---

57.    The personal benefit to Swartz of these unauthorized "special bonus"

programs that were never disclosed – the TyCom Bonus ($16,610,687), the ADT

Automotive Bonus ($12,844,632), and the Flag Bonus ($6,971,675) – cost the Company

over $36,426,994 in less than twelve months.  The combined cost to the Company of all

of these unauthorized bonuses for all the recipients was $167,295,808.  Swartz did not

obtain proper approval of these programs from the Board or its Compensation

Committee.

### Swartz's Other Acts of Self-Dealing

58.    Throughout this same time period, Swartz engaged in a pattern of self-

dealing and exploitation of Tyco's corporate assets:

> a.    Swartz purchased with Company funds a luxury apartment
> for his own use in 50 Central Park South, New York for
> approximately $15,508,000 and improved the property for an
> additional $1,035,402, without appraisals.

> b.    Swartz sold his former residences at 3 Runawit Road, Rye,
> NH  and  66 Front Street, Exeter, NH to the Company in December
> 1995 for $305,000 and in January 1997 for $464,000, respectively.
> In both cases the properties were later resold by Tyco for
> approximately only two-thirds to three-quarters of the amount that
> was paid to Swartz for the property.

> c.    On May 6, 2002, Swartz caused the Company to enter a
> notation in its books and records purporting to transfer title to the
> Tyco-owned apartment in which he resided at 30 E. 85th Street,

19

New York to himself at its depreciated book value of $9,646,975, which Swartz paid in cash. This transaction was in violation of the Nominee Agreement in which he agreed that he did not have the right to purchase the property. (See Ex. 31, attached hereto.) No appraisal was performed in connection with this transfer, nor was it authorized. (On July 18, 2002 Swartz, when confronted with the impropriety of this transaction, agreed to reverse that transaction and his KEL account was credited $9,646,975 to reflect this reversal.)

d. On March 1, 2001, without approval by the Compensation Committee or the Board, Swartz caused Tyco to pay him a reimbursement of $1.2 million to cover lost deposits on personal real estate transactions involving apartments in Trump Tower in New York City.

e. Swartz and Kozlowski jointly invested in other personal business ventures such as restaurants and real estate investments, for which Swartz, under the guise of a sale of the investment to the Company, caused unapproved reimbursements to be made by the Company to them with Company funds when the investments became unprofitable.

f. In violation of Company policy, Swartz exploited his position as Company Chief Financial Officer and repeatedly sold shares to Tyco subsidiaries to repay loans he had improperly obtained through abuse of the KEL and Relocation programs.

59. Swartz also freely used Company funds to pay for his other personal interests, for which the Company has not been fully reimbursed:

a. Swartz had extensive personal use of company automobiles and aircraft and used Tyco funds to pay for commercial air travel for his family. This personal use resulted in Tyco imputing income to Swartz of $320,739 for 2002, $508,834 for 2001, and $466,766 for 2000, for all of which he owes reimbursements to the Company. (In prior years where the aggregate of this other income exceeded $50,000, Swartz claimed to have reimbursed the Company, but such reimbursements were deficient, untimely or never made).

b. From 2000 until September 2002 when Swartz left Tyco, Swartz lived rent free in an apartment at 30 East 85th Street, New

20

York. In addition, Tyco paid for numerous other Swartz personal expenses including but not limited to insurance, management fees, cable service, utilities, security services, repairs, club memberships to Wentworth-by-the-Sea Country Club and the Boca Raton Resort Club.

c. Kozlowski and Swartz employed a Tyco employee to maintain their personal books and records and reimbursed Tyco for her salary. However, this employee had two assistants dedicated exclusively to the same personal tasks for Swartz and Kozlowski, neither of whose salaries was reimbursed by Swartz.

d. Swartz caused the Company to reimburse him for Miami Heat and Florida Panther tickets ($123,222); a deposit loss on Newport property ($101,500); a hotel stay at the New York Palace ($28,045); tickets to Billy Joel and Elton John ($1,140); a helicopter trip for his wife ($6,028); and other expenses charged to Swartz expense accounts from 1996 – 2002 (over $375,000).

60.   As the Chief Financial Officer of the Company, Swartz owed strict fiduciary duties to the Company. Swartz was required to act at all times honestly and in good faith with a view to the best interests of the Company and to exercise the care, diligence, and skill that a reasonably prudent person would exercise in comparable circumstances and not to engage in such acts of self-dealing as those described above.

### Concealment of Material Information from the Board:
### Payments to Then-Lead Director Walsh

61.   Swartz also breached his fiduciary duties, and engaged in deliberate acts of concealment in 2001 and 2002, when he learned, in July 2001, that Kozlowski had agreed to pay $20 million in Company funds to then-director Frank Walsh.

62.   In early 2001, Kozlowski suggested that Tyco acquire a financial services company, and Walsh later introduced Kozlowski to Al Gamper, the Chairman and CEO

21

of The CIT Group, a large financial services company.  Subsequent negotiations led to an agreement for Tyco to acquire CIT, which closed in June 2001.

63.    After the terms of the CIT transaction had been agreed to, Walsh and Kozlowski agreed that Tyco would pay Walsh a $20 million fee for his role in the transaction.  (See Ex. 29, attached hereto.)  Kozlowski told Walsh, and Walsh agreed, that they should conceal this payment from the Board.  Swartz, in fact, approved the payment in July 2001 and caused the payments to Walsh to be made. (See Ex. 30, attached hereto.)

64.    Although he was both a member of Tyco's Board of Directors and Tyco's CFO, Swartz did not immediately inform Tyco's other directors, who (apart from Kozlowski and Walsh) did not become aware of the Walsh payment until January 2002. Walsh has since pled guilty to concealing his receipt of these funds from Tyco.

**Concealment of Material Information from the Board:
Unauthorized Benefits**

65.    In April 2002, the Corporate Governance Committee announced a review of Company records and policies.  This review raised further questions regarding how certain approved programs were being run and regarding certain persons (including Mark Belnick, Tyco's Chief Corporate Counsel).

66.    On May 9, 2002, director Richard Bodman, at the request of the Corporate Governance Committee (see Ex.31, attached hereto), instructed Swartz to provide comprehensive records on various subjects, including:

   a.    Charitable contributions over $10,000;

22

b.  All use of apartments and other company assets by employees;

c.  All use of company planes;

d.  All stock transactions by Kozlowski, Swartz and Belnick for the preceding five years;

e.  All loans to members of management; and

f.  Any other matters that Swartz, in his judgment, thought should be brought to the Board's attention.

67.  At no time did Swartz advise Mr. Bodman about undisclosed transactions of which he was aware, including:

a.  The unauthorized TyCom Bonus and loan forgiveness program that cost the Company over $95 million;

b.  The unauthorized ADT Automotive Bonus and forgiveness program that cost the Company over $55 million;

c.  The unauthorized purported forgiveness of his and Kozlowski's KEL loans, which (with the additional $1 million credit to the KEL account of the Tyco event planner) cost the Company $38.5 million;

d.  His misappropriation of other Tyco funds for his and other executives unauthorized accelerated vestings in Tyco restricted stocks;

e.  His acts of self-dealing wherein he caused the Company to reimburse him  for millions of dollars of losses he experienced in his personal investments; and;

f.  His purchase, three days earlier, in violation of his nominee agreement, of the Tyco-owned apartment at 30 East 85th Street, in which he was living.

### Swartz's Other Breaches of Fiduciary Duties

68.   Swartz permitted Kozlowski to exploit the Company's programs, as well as to expense properties used exclusively by Kozlowski, to the Company:

a.   Swartz claimed to have monitored Kozlowski's KEL loan usage, and noted one instance in which Kozlowski had borrowed more than he was allowed; in fact, Kozlowski had repeatedly borrowed more under the KEL program than he was allowed, and for purposes that Swartz knew were unauthorized;

b.   After Kozlowski's 1995 purchase of 167 Little Harbor, New Castle, NH, for his personal use, Swartz approved Kozlowski's expensing the cost of furnishing ($269,000) and maintenance costs to the Company;

c.   After Kozlowski's 1996 purchase of 59 Harbor Road, Rye, NH, of which he made personal use, Swartz approved Kozlowski's expensing its maintenance to the Company;

d.   Swartz approved Kozlowski's lavish Fifth Avenue apartment at 817 Fifth Avenue, New York through a corporate lease with an annual rent of $264,000 and Kozlowski's purchase of a second, more extravagant apartment at 950 Fifth Avenue, without appraisals, at a total cost to the Company of more than $20 million, including improvements;

e.   After Kozlowski's 1997 purchase of 471 East Alexander Palm Rd., Boca Raton, with Company funds, Swartz permitted Kozlowski to make personal use of the property for himself and visiting family members;

f.   After Kozlowski sold his New Hampshire home, 10 Runnymede Drive, North Hampton, NH, to the Company in 2000 at an inflated price of three times its value (see Ex. 32, attached hereto), Swartz caused the Company not to record title to the property, thereby failing to secure the Company's right and interest in the property;  Swartz further permitted the Company to pay all expenses associated with the property, even though Kozlowski's ex-wife continued to make personal use of the property without a lease or without reimbursement to the Company of expenses.

---

69.   On September 12, 2002, Swartz was indicted by the District Attorney for the County of New York for enterprise corruption, thirteen counts of larceny, and thirteen counts of falsifying business records (see Ex. 34, attached hereto), and the Securities Exchange Commission filed an enforcement action against Swartz, Kozlowski, and Belnick for fraud against the Company (see Ex. 35,  attached hereto.)

70.   Several lawsuits have been  filed against Tyco in which the Plaintiffs contend that Tyco is liable to them because of Swartz's and others' misconduct.  These include, but are not limited to: In Re Tyco International Ltd. Securities Litigation, MDL-Docket No. 02-1335-B Securities Action, filed in the United States District Court for the District of New Hampshire (hereinafter the "Securities Complaint"); Manko et al. v. Kozlowski et al and Tyco International, Ltd.,  MDL-Docket No. 02-1335-B Derivative Actions, filed in the United States District Court for the District of New Hampshire (hereinafter the "Derivative Complaint"); and Overby et al. v. Tyco International Ltd., et al, MDL Docket No. 02-1357-B ERISA Actions, filed in the United States District Court for the District of New Hampshire (hereinafter the "ERISA  Complaint").

### FIRST CAUSE OF ACTION
### (BREACH OF FIDUCIARY DUTY)

71.   Plaintiffs realleges paragraphs 1 through 70 as if set forth fully herein.

72.   At all relevant times, Swartz owed strict fiduciary duties to the Company. Swartz failed to fulfill his obligations to the Company, failed to faithfully execute service, and breached his duties to Tyco in various ways that reasonably and foreseeably caused substantial harm to Tyco.

25

73.  Such wrongful conduct includes, but is not limited to, the matters set forth above.

74.  As a direct and proximate result of Swartz's breaches of his fiduciary duties the Company has been damaged in an amount that far exceeds the amounts Swartz directly misappropriated for himself, and Swartz is liable for all such damages, which can only be determined at trial.

75.  As a disloyal fiduciary, Swartz is also required to disgorge all compensation and benefits (whether in cash, stock, options or otherwise) he received from Tyco from the inception of his wrongful conduct through the date of his departure.

76.  Swartz is also liable for punitive damages, in an amount to be determined at trial, because of the willful, wanton, and intentional nature of Swartz's conduct, and his abuse of his position of trust.

## SECOND CAUSE OF ACTION
## (INDUCING BREACH OF FIDUCIARY DUTY)

77.  Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

78.  Kozlowski, Swartz, and Belnick each owed Tyco strict fiduciary duties. Swartz was well aware of the duties that he, Kozlowski and Belnick owed to the Company, and he deliberately used his position as Chief Financial Officer to induce others within the Company to breach their fiduciary duties to Tyco, and to fail to faithfully execute service to their principal, Tyco. Such wrongdoing includes the misconduct described above.

26

79.   As a direct and proximate result of these breaches of fiduciary duty induced by Swartz, Swartz failed to fulfill his obligations to the Company, failed to faithfully execute service, and breached his duties to Tyco in various ways that reasonably and foreseeably caused substantial harm to Tyco.

80.   As a direct and proximate result of these breaches of fiduciary duty induced by Swartz, the Company has been damaged in an amount that far exceeds the amounts Swartz directly misappropriated for himself, and Swartz is liable for all such damages, which can only be determined at trial.

81.   As a disloyal fiduciary, Swartz is also required to disgorge all compensation and benefits he received (whether in cash, stock, options or otherwise) he received from Tyco from the inception of his wrongful conduct through the date of his departure.

82.   Swartz is also liable for punitive damages, in an amount to be determined at trial because of the willful, wanton, and intentional nature of Swartz's conduct, and his abuse of his position of trust.

### THIRD CAUSE OF ACTION
### (CONSPIRACY TO BREACH FIDUCIARY DUTY)

83.   Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

84.   Rather than fulfill their duties to the Company, Swartz, Kozlowski, and Belnick agreed among themselves to breach their duties to the Company and fail to faithfully execute service to their principal, Tyco.

85.   As a direct and proximate result of the joint and concerted action between and among Swartz, Kozlowski, and Belnick to breach their fiduciary duties, the Company

has been damaged in various ways, which far exceed the amounts Swartz directly misappropriated for himself. Swartz is jointly and severally liable for all such damages, which can only be determined at trial.

86.   As a disloyal fiduciary, Swartz is also required to disgorge all compensation and benefits he received (whether in cash, stock, options or otherwise) he received from Tyco from the inception of his wrongful conduct through the date of his departure.

87.   Swartz is also liable for punitive damages, in an amount to be determined at trial, because of the willful, wanton, and intentional nature of Swartz's conduct, and his abuse of his position of trust.

## FOURTH CAUSE OF ACTION
## (FRAUD)

88.   Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

89.   From at least 1997 through 2000, Swartz made false representations to the Company and in its financial documents, including but not limited to the Company's Directors' and Officers' Questionnaires (dated August 20, 1996, November 30, 1998, August 12, 1999, December 30, 1999, February 11, 2000, January 5, 2001, and others), about his KEL and relocation indebtedness and the indebtedness of other key executives, as well as the forgiveness of certain loans.

90.   Swartz's representations to the Company regarding his loans and other compensation were knowingly false. Swartz fraudulently concealed facts from the Board, including the amounts received by him as purported compensation and benefits arising from his illegal conduct. Swartz made his false representations knowing that the

28

Company would rely on his misrepresentations and concealment in preparing its financial disclosures to the public, and in fact the Company did rely on Swartz's false representations, to its detriment.

91.    The Company has been, and continues to be, damaged as a result of the belated discovery of the facts regarding unauthorized loans and purported compensation received by Swartz and others at the Company.  Moreover, Swartz's actions were willful, wanton and undertaken with malice sufficient to subject Swartz to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## (ACCOUNTING)

92.    Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

93.    Swartz breached his fiduciary and other duties to the Company, and failed to faithfully execute service, in various ways, and profited from his breach of duty through the receipt of unauthorized and undisclosed amounts of money and credits, interest-free use of millions of dollars of Tyco's funds for unauthorized relocation loans, and unauthorized grants of hundreds of thousands of shares of Company stock (as restricted stock or options), which Swartz promptly sold and on which he earned millions.

94.    Swartz commingled the funds he received in breach of his fiduciary duties, and the proceeds obtained on his use of those funds, with his own funds.

95.    Swartz must therefore render an account to Tyco for the funds that he received during the course of his employment, including an accounting for the interest on

the funds he obtained and benefits he obtained as a result of his wrongful use of the Company's funds.

## SIXTH CAUSE OF ACTION
## (CONSTRUCTIVE TRUST)

96.   Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

97.   For at least the past several years, Swartz was a disloyal fiduciary, abusing his position as Chief Financial Officer to breach his own duties to the Company, to induce others to breach their duties to the Company, and conspiring with others to breach their fiduciary duties to the Company, including in the ways detailed above.

98.   Swartz profited enormously and was enriched by his disloyal conduct. Swartz should therefore be deemed to hold the funds and benefits he has received, and the interest and proceeds obtained on the use of the funds he wrongfully received, in constructive trust for the benefit of Tyco.

## SEVENTH CAUSE OF ACTION
## (UNJUST ENRICHMENT)

99.   Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

100.  Swartz has been unjustly enriched, and the Company wrongfully harmed, in various ways as a result of Swartz's wrongful conduct set forth above.

101.  The Company is therefore entitled to recover from Swartz all sums by which he has been unjustly enriched, including all cash, stock and options he wrongfully received from Tyco, and the proceeds from his use of that cash, stock and options.

30

## EIGHTH CAUSE OF ACTION
## (CONVERSION)

102. Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

103. Over the past several years, Swartz came to exercise, either directly or indirectly, unauthorized dominion and control over hundreds of millions of dollars of Company funds, stock and assets.

104. Swartz's dominion and control over the property has been to the exclusion of, and in defiance of, the Company's rights, or has otherwise interfered with the rights of Company in and to such property.

105. Tyco has been damaged by Swartz's conversion of Company property, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
## (CONTRIBUTION)

106. Plaintiffs reallege paragraphs 1 through 70 as if set forth fully herein.

107. Swartz owed strict fiduciary duties to Tyco, and was required to act at all times in good faith with a view to the best interests of Tyco and to exercise the care, diligence and skill that a reasonably prudent person in his position would exercise in comparable circumstances.

108. Swartz failed to fulfill his fiduciary obligations to Tyco, failed to faithfully execute service, and breached his duties to Tyco in numerous ways, including those set forth above.

31

109. Swartz's actions, as set forth above, have unnecessarily subjected Tyco to legal costs and fees as well as exposed Tyco to damage awards.

110. To the extent that any judgment adverse to Tyco is rendered against Tyco as a result of Swartz's misconduct set forth above, Swartz is jointly and severally liable for the amount determined by the Court to be attributable to Swartz's conduct, including the attorneys fees and costs incurred by Tyco in those actions.

WHEREFORE, Tyco respectfully requests that the jury find, and the Court enter judgment, in Plaintiff Tyco's favor in an amount in excess of $400 million against Defendant Swartz, as follows:

A. On the First, Second, Third, Fourth, and Eighth claims, and each of them, awarding Tyco actual and compensatory damages in an amount to be proven at trial, and ordering Swartz to disgorge of all compensation and benefits (including restricted and unrestricted stock and stock options) obtained during the course of Swartz' breaches of his fiduciary duty and other wrongful conduct described above, and the proceeds thereof;

B. On the Fifth claim, ordering Swartz to account for all amounts received from the Company as actual compensation and unauthorized amounts taken from the Company as purported compensation, and the use of any and all funds;

C. On the Sixth and Seventh claims, imposing a constructive trust on all of Swartz's actual compensation, unauthorized amounts taken from the Company as purported compensation, and benefits obtained from the Company during the course of his unlawful conduct, and all proceeds obtained from the use thereof, with interest as allowed by law in an amount to be proven in this suit;

D. On the Ninth claim, finding Swartz liable for the amount determined by the Court to be attributable to Swartz's conduct, including the attorneys fees and costs incurred by Tyco;

E. Awarding Tyco exemplary and punitive damages as may be available at law for Swartz's intentional misconduct; and

32

F.  Such other and further relief, including interest, costs, disbursements and attorneys' fees incurred herein, as permitted by law.


New York, New York
April 1, 2003


BOIES, SCHILLER & FLEXNER LLP

By:

_____
Ann M. Galvani (AG-1417)
David W. Shapiro (DS-8121)
    333 Main Street
    Armonk, New York  10504
    (914) 749-8200

Of Counsel
Steven W. Davis
    100 S.E. 2nd Street, Suite 2800
    Miami, Florida  33131
    (305) 539-8400

Attorneys for Plaintiffs

## Demand for Jury Trial

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a jury trial of all issues

properly triable hereby.

New York, New York
April 1, 2003

**BOIES, SCHILLER & FLEXNER LLP**

By:

_Ann M. Galvani_

Ann M. Galvani (AG-1417)
David W. Shapiro (DS-8121)
    333 Main Street
    Armonk, New York  10504
    (914) 749-8200

Of Counsel
Steven W. Davis
    100 S.E. 2nd Street, Suite 2800
    Miami, Florida  33131
    (305) 539-8400

Attorneys for Plaintiffs